Daniel C. MURRAY

v.

UNITED FOOD & COMMERCIAL WORKERS UNION, LOCAL 400, Donald Cash, Christian Sauter

No. CIV. JFM–98–2221.

United States District Court, D. Maryland.

Oct. 31, 2002.

Paul Francis Evelius, Vivian Lee Adkins, Wright Constable and Skeen LLP, Baltimore, MD, for Plaintiff.

Francine K. Weiss, Kalijarvi Chuzi and Newman PC, Washington, DC, for Defendant.

## MEMORANDUM

MOTZ, District Judge.

In 1998, Daniel C. Murray brought suit against his employer, United Food & Commercial Workers Union, Local 400 ("the Union" or "the Local") and Donald Cash, alleging he was discriminated against on the basis of his race in violation of 42 U.S.C. § 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("§ 1981"). Subsequently, Murray amended his complaint to also allege defamation under Maryland law against the Union and Christian Sauter. In November 1998, I granted Defendants' motion to dismiss and compel arbitration

of the discrimination claim and Defendants' motion to dismiss the defamation claim for failure to state an actionable claim. On appeal, those decisions were reversed.

Defendants have now moved for summary judgment on all claims, and Plaintiff cross-filed for summary judgment. For the reasons set forth below, I will deny Plaintiff's cross-motion for summary judgment and grant Defendants' motions.

## I.

A long time union member, Daniel C. Murray, who is Caucasian, began working for United Food & Commercial Workers Union, Local 400 as an organizer in February 1997. (Pl.'s Mem. at 7.) Prior to this time, Murray served as shop steward for the Union at the Giant store where he was employed as a produce clerk. He had previously been called upon by the Local to take short-term leaves of absence to assist with organizing activities and campaigns. (Pl.'s Mem. at 2–5.)

In 1997, after the Local underwent a change in leadership, the new President, James Lowthers, also Caucasian, reconfigured and fortified the Organizing Department of the Local by asking Christian Sauter, another Caucasian and head of Organizing, to add organizers to the understaffed department. (Def.'s Mem., Ex. 1 at 298.) Murray was one of the union members asked if he would be interested in taking an extended leave of absence from his job, pursuant to the collective bargaining agreement with Giant, to serve the Local as a full-time organizer. Murray accepted this offer. It was understood that Murray's first year of employment with the Union would be on a probationary basis, after which Murray might be placed on staff provided the Union was satisfied with his performance during the probationary period.[1] (Pl.'s Resp. at 7.)

In January 1998, shortly before his probationary period was to end, Murray was made a full-time staff member along with two other organizers, one African–American and one Hispanic. (Pl.'s Resp. at 9; Def.'s Mem., Ex. 7, Attach. 1.) Like the initial decision to bring Murray on board as an organizer, Lowthers made the decision to end Murray's probationary status based, in part, on Sauter's advice and consent. (Def.'s Mem., Ex. 1 at 303.)

Throughout Murray's tenure with the union, the Organizing Department continued to add organizers through a similar procedure. As a result, the department consisted almost exclusively of largely inexperienced organizers. Early in 1998, Lowthers realized the newly reconfigured Organizing Department was not performing as well as he had hoped and asked Donald L. Cash, an African–American and Executive Assistant to the President, to assist Sauter. (Pl.'s Resp. at 10.) The degree of influence Cash exercised within the hierarchy of the Local's Organizing Department is in dispute, but both sides agree he was a seasoned organizer who consulted with Lowthers and Sauter regarding the efforts and progress of the Organizing Department.

As part of the changes suggested by Cash, each of the new organizers within the department was given at least one campaign that was primarily his or her responsibility. (Def.'s Mem., Ex. 1 at 424.) In March or April, Murray began working on a campaign to organize the workers at a

---

1. The union member could be asked to return to his job at any time during the probationary period, and the probationary period could be extended for up to a year. At all times, the union member retained the option of returning to his regular job after ceasing employment with the union itself. (Def.'s Mem., Ex. 1 at 291–93.)

K–Mart after an employee of the store, Emma VanNess, began sending union authorization cards she had collected to the Local. (Pl.'s Resp. at 12.) This campaign started promisingly, with a large number of authorization cards collected by VanNess within a relatively short period of time. (Def.'s Mem., Ex. 1 at 427.) Ultimately, however, the Union failed in its efforts to unionize these employees. (Def.'s Mem., Ex. 1 at 1338.)

During this failed campaign, the Local alleges, the Union's management became disenchanted with Murray's performance and his progress as an organizer. According to the Union, prior misgivings regarding his interpersonal communication skills, combined with a reluctance to complete assigned tasks, blossomed into a full-blown problem when Murray made a threatening comment to Sauter in June of 1998. Shortly thereafter, at the behest of Lowthers, Sauter discharged Murray and asked him to return to his position as a Giant employee.

Murray's defamation claim is based on events that occurred in the wake of his dismissal. Sauter and another organizer, Jennifer Leonard, also Caucasian, attempted to take over the K–Mart campaign. (*Id.* at 461.) While meeting with key members of the group of employees still interested in union representation, VanNess expressed her dissatisfaction with Murray's absence from the campaign. Sauter allegedly responded, "Believe me,

he was not a good organizer." (*Id.* at 1353) There is no evidence in the record suggesting this comment was heard by any K–Mart employees other than VanNess.

## II.

Defendants argue they are entitled to summary judgment on Murray's claim he was discharged on the basis of his race in violation of Title VII and § 1981.[2] Presentation of direct evidence is not required to survive a motion for summary judgment,[3] but plaintiff must present enough circumstantial evidence of discrimination to satisfy the *McDonnell Douglas* proof scheme. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In order to establish a prima facie case of discriminatory discharge, a plaintiff must establish he (1) is a member of a protected class; (2) has satisfactorily performed the job; (3) has been discharged; and (4) has been replaced by a similarly qualified person outside the class (or the position remains open). *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 607 (4th Cir.1999). If the plaintiff establishes a prima facie case, the burden shifts to the employer to advance a legitimate, nondiscriminatory reason for the dismissal. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089,

**2.** In the context of employment discrimination, § 1981 claims are subject to a similar proof scheme as Title VII claims. *See Gairola v. Virginia Dep't of Gen. Servs.,* 753 F.2d 1281, 1285–86 (4th Cir.1985).

**3.** Plaintiff does present *some* evidence that might be termed "indirect" evidence of discrimination in the form of comments made by Cash, but fails to show any connection between these comments and the adverse employment action taken. This evidence will be

addressed *infra* as part of the circumstantial case against the Defendants. Furthermore, Murray's assertions that his firing was probably "a black thing"(a statement attributed to others who all deny making such a comment and, in turn, attribute the comment to Murray himself) do little to prove his case. *See Williams v. Cerberonics, Inc.,* 871 F.2d 452, 456 (4th Cir.1989) (finding plaintiff's own allegations of discrimination unilluminating).

67 L.Ed.2d 207 (1981). The defendant's burden at this point is not one of persuasion, but merely one of production. *See id.* If the employer successfully proffers such an explanation, the burden returns to the plaintiff to show that the proffered reason or reasons are a pretext for impermissible discrimination. *See St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742; *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio,* 53 F.3d 55, 57–58 (4th Cir. 1995).

#### A.

■ Murray is able to make out a prima facie case of discrimination. The first and third elements of the prima facie case are not in dispute. Murray might ultimately have some trouble proving he was satisfactorily performing his job as required in the second element. However, he has met this element at this stage of the burden-shifting analysis by showing he was moved from probationary status to a staff position just six months before being terminated. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089 (pointing out plaintiff's burden of establishing a prima facie case is not an onerous one); *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 244 (4th Cir. 1982) (noting time between showing of satisfactory performance and dismissal must be reasonably short). While Lowthers later explains he had some misgivings about moving Murray from probationary to staff employee and that the decision was made to move all three new organizers to staff positions in part due to internal morale considerations (*see* Def's Mem., Ex. 1 at 303–05), the fact remains Murray was passed out of his probationary period—

indicating his performance had been at least marginally satisfactory to that point.

While it is also unclear whether Murray meets the fourth element of the prima facie case, viewing the evidence in the light most favorable to Plaintiff, I will assume he does. The Local claims it has hired numerous people as organizers since Murray's departure—nine of them have been Caucasian, two African–American, one Hispanic, and one Asian. (*See* Def.'s Mem., Ex. 7, Attach. 1.) The Defendants argue this certainly does not create a presumption that Caucasians were disfavored in any way. While this contention may have some validity, it must be kept in mind that at this stage of the burden-shifting analysis, plaintiff's burden is not high. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Technically, the first person promoted into a regular staff position after Murray's departure was African–American.[4] (*See* Def.'s Mem., Ex. 7, Attach. 1.) Viewing this evidence in the light most favorable to the plaintiff, the Court finds Murray barely makes out a prima facie case of discrimination.

#### B.

■ Defendants, in turn, have met their burden of production by offering legitimate, nondiscriminatory reasons for the adverse employment action. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. Specifically, the Local offers four reasons for dismissing Murray: (1) his failure to make homecalls as required; (2) the quality and timeliness of the charts prepared detailing the progress of his campaign; (3) his inter-

---

**4.** The fact that the Union's next five choices to move into regular staff positions as organizers were all Caucasian is not helpful to Murray's case. However, all six of these promotions occurred well after the filing of the original complaint in this case, and thus raise the question whether they were made to establish a favorable evidentiary record. This prevents the Court from placing any weight on this while considering Defendants' motion for summary judgment.

personal communication skills; and (4) a threatening comment made to Sauter.

The reasons provided by the Union are sufficiently specific to allow Murray to refute them. Employers who rely entirely upon subjective considerations to justify a decision to discharge an employee leave themselves more vulnerable to charges of pretext, but decisions based on both subjective and objective grounds are not as easily fabricated. See Chapman v. AI Transport, 229 F.3d 1012, 1033–35 (11th Cir.2000) (discussing validity of subjective opinions based on clear and specific factual basis). In this case, the Local has relied upon subjective considerations, such as the interpersonal skills, but has supplemented them with objectively verifiable problems. In fact, the Local maintains it was a conglomeration of factors culminating in the threatening comment made to Sauter that forced its decision to discharge Murray. See Karpel v. Inova Health System Servs., 134 F.3d 1222, 1228 (4th Cir.1998) (relying on a conglomeration of factors).

### C.

Because Defendants have met their burden of production within the McDonnell Douglas framework, the presumption dissipates and Plaintiff must prove the proffered reasons for his dismissal are false and/or serve as pretext for discrimination. I will address seriatim Murray's attempts to refute the reasons proffered by the Defendants.

### 1.

Murray argues he did make the homecalls required as part of his job, that Sauter had reduced his required number of homecalls, and that the Local knew he was homecalling as required when they discharged him.

When a store is being organized by the Union, the Union must establish it has sufficient employee support before filing a petition for an election. The process begins with getting employees to sign authorization cards requesting an election be held. The Union, however, is not convinced the mere signature on the card indicates the Union has the support of the person who has signed it. The Local therefore requires its organizers to visit with the individual employees in their homes, discuss the benefits of unionization, and get a longer, first-hand impression of that employee's stance with respect to the Union. (See Def.'s Mem., Ex. 1 at 427–28.) Multiple homecalls on the same employee are not uncommon. It is undisputed that homecalls are an important part of the organizer's job.

According to the Local, Murray resisted performing homecalls and did not do them with the frequency requested. Specifically during the K–Mart campaign, a large number of the authorization cards were obtained by Emma VanNess, and the Local believed it was extremely important in such a situation—where an organizer had not been present at the signing of the authorization cards—for the organizer to contact each of these people personally, in his or her home, to insure the person understood what it was they were signing and to convince the person a union was necessary. (See id.) It is undisputed Murray did some homecalls, but the Local claims he was not doing enough of them[5] —pointing to the much higher homecalling rates of other organizers as proof of his insufficient performance. To support this claim the Union points to two sets of documents, the organizer weekly reporting forms and the "Person Profiles." (See Def.s Mem., Ex. 7, Attach. 2 & 3.) Murray

---

**5.** Though Plaintiff claims Sauter told him he only needed to homecall committee members, he presents no evidence to support this contention.

did not fill out his weekly reporting forms for weeks at a time, despite this being part of the job. *See Karpel,* 134 F.3d at 1226 (upholding grant of summary judgment based, in part, on the employer's assertion the employee failed to complete monthly summaries). Although the Union does not rely on Murray's failure to fill out these forms as a primary reason for dismissal, the lack of information regarding his activities underscores the Local's belief he was not performing the required homecalls.

The burden rests with Murray to prove the failure to perform requested homecalls did not influence the Union's decision to dismiss him. In his attempt to do so, he never addresses the fact he did not complete his weekly organizing reports, except to say that others failed to complete these reports as well. Though others may have occasionally missed a week or two, none of the gaps in the recording of their activities are as large as the time periods for which Murray has no weekly organizer's reports.[6] Without these reports, Defendants point out, it was difficult for management to know whether Murray was doing the homecalls as he now claims.

 To refute Defendants' contention, Murray relies on a different set of documents, the Organizers Itineraries, or "call-in sheets." (*See* Pl.'s Resp., Ex. 22.) It was customary for the organizers to call Sauter's secretary several times a day so she could record the activities in which each organizer was engaged. The call-in sheets presented by Plaintiff show he told the secretary he was engaged in K–Mart homecalling on many days. However, Plaintiff cannot show he recorded this information in weekly organizers reports, which the Local claims it relied on in assessing organizer performance, or that he entered the information on the individual "person profiles."

The "Person Profiles" provided by Defendants, detailing the contacts made with individual employees at the K–Mart, indicate Murray had only performed eight homecalls. Murray attempts to refute this contention by challenging generally the thoroughness of the information presented on "person profiles." (*See* Pl.'s Resp., Ex. 26.) With the evidence he presents, Plaintiff proves that person profiles only detail the last three contacts made with a particular individual, even if numerous contacts have previously been made, and asks the factfinder to infer that homecalls were made on the K–Mart campaign that are not recorded on the profiles. The evidence supplied by Plaintiff does not make the latter a reasonable inference. The profiles he provides are from a completely different campaign, many of which detail the work of other organizers (Rep. number 013, for instance, instead of Rep. number 004—Murray). While some of them include a few homecalls made by Murray on that campaign, they are all from late 1997 when the Local was presumably still marginally satisfied with the work he was doing. Pointedly missing from Plaintiff's presentation of profiles are any from the K–Mart campaign showing more than three contacts.[7]

Plaintiff apparently fails to realize, with respect to homecalls, that it is his burden not simply to prove he was homecalling, but that the Union knew he was homecall-

---

6. It is also unhelpful to focus on other employees who have a deficiency in one area and claim they are similarly situated to Plaintiff who, Defendants allege, had a "conglomeration" of problems. *See Karpel,* 134 F.3d at 1228.

7. The profile for Patricia Orr, the one K–Mart employee (in addition to VanNess) who testifies that Murray did visit her in her home, shows that she was contacted a total of three times and was never homecalled. (*See* Def.'s Reply, Ex. 31.)

ing as frequently as required and pretended not to know so it could fire him. While a genuine issue of fact may exist as to whether he did more homecalls than the Local suggests, that fact is not material if the Union was unaware of his activities. If Murray had documented his homecalling activities as his job required, by filling out the organizer's reporting forms every week or inputting the data on person profiles, it would have been easier for him to show that his frequency of homecalling was merely pretext, as he now claims. However, a rational jury would have to find it was reasonable for the employer to think he was not doing the necessary homecalls if Murray was not documenting this information as requested. He failed to complete these forms, and he fails to show the Defendants' first proffered reason for dismissing him was fabricated.

### 2.

■ Murray contends it is pretextual for the Union to rely upon the untimeliness and poor quality of the K–Mart charts because he was given extra time to complete his charts and eventually put together an adequate, complete set. The organizers were supposed to maintain charts—with various pieces of information about each employee within a given store visually displayed in an agreed upon format—so the progress of a campaign could quickly be discerned. (*See* Def.'s Mem., Ex. 1 at 414.) In an effort to train the relatively inexperienced organizers, the Local was conducting meetings where, among other things, each organizer with a campaign of her own would present her charts to the group and talk about the progress of the campaign. Murray was actually one of the first organizers to receive training on how to create these kinds

of charts and, according to the Local, should have been one of the most proficient. (*See id.* at 443.) Instead, they say, he resisted doing the charts and questioned their value as an organizing tool. (*See id.* at 84.)

After putting off his superiors for several weeks on the ground that he did not have the necessary information to create the charts, Murray finally presented a set of charts on the K–Mart campaign at a Sunday organizers' meeting on June 14, 1998. (*Id.* at 83.) Though some question remains as to what happened to those charts after that meeting, by all accounts (including Cash's, Sauter's, and that of the other five organizers present at the meeting) the charts were incomprehensible.[8] (*Id.* at 443, 594, 687, 745, 1027, 1122, & 1169.) Based on this unrefuted testimony and the fact another organizer, Heith Fenner, was then assigned to assist Murray in redoing these charts, it would be unnecessary for a factfinder to examine the actual charts to determine their adequacy. Murray does not even explicitly defend the adequacy of his charts, and no rational jury could find the charts presented were at the level expected by the employer. *See Carter v. Ball*, 33 F.3d 450 (4th Cir. 1994) (finding failure to satisfactorily complete an assigned task within established deadlines a legitimate reason for dismissal). Murray is unable to present evidence proving the charts were adequate or that the Local did not honestly believe the charts were poorly done.

### 3.

■ Murray claims he possesses the requisite interpersonal communication skills to be an effective organizer. Subjective claims regarding personality traits are

---

**8.** Plaintiff himself admits the charts he worked on were not acceptable. (Def.'s Mem., Ex. 1 at 175.)

inherently difficult for a trier of fact to evaluate, and therefore suspect when presented as the basis for dismissal. Were Murray's interpersonal skills the sole basis for the dismissal, a jury might suspect the employer's reliance upon it. But as only part of a conglomeration of factors, Murray's alleged difficulty with interpersonal communication is able to bear the light load placed upon it in this case. *See Page v. Bolger,* 645 F.2d 227, 230 (4th Cir.1981) (finding subjective considerations within employment decision reasonable).

All descriptions of the organizer's job indicate it was extremely important an organizer be able to quickly develop a relationship of trust and familiarity with the people he was attempting to organize. By Murray's own admission, he is an introvert by nature.[9] (*See* Def.'s Mem., Ex. 1 at 194.) Certainly, Murray's nature would not be held against him if he was successfully working around it to do his job, but it is also not unreasonable for the Defendants to have noticed that interpersonal communication was not his forte. Emma VanNess's testament to Murray's friendly nature not withstanding, no reasonable jury could find this employer believed Murray possessed the requisite interpersonal relationship skills. *See Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231 (4th Cir.1991) (holding opinion of co-workers close to irrelevant); *Smith v. Flax,* 618 F.2d 1062, 1067 (4th Cir.1980) (affirming j.n.o.v. because plaintiff had not provided opinions of his abilities from qualified, objective sources). Murray fails to present sufficient evidence to refute Defendants'

contentions regarding his communication skills.[10]

### 4.

■ .Finally, Murray argues the Local's reliance on the threatening comment made to Sauter is pretext because the comment was not really threatening. The incident occurred in Sauter's office a few nights after the presentation of Murray's K–Mart charts. Murray was asked to stay late in order to work on a new set of K–Mart charts with Fenner, a less experienced organizer. By Murray's own account, he found having his work critiqued by a less-experienced organizer humiliating. (*See* Def.'s Mem., Ex. 1 at 85.) After working on the charts for some portion of time, Murray announced that he was going to leave shortly. When Sauter informed him he couldn't go home until the charts were completed, Murray responded, "Now you're on thin ice." (*Id.* at 92.)

While much time has been spent by the Plaintiff trying to prove Sauter did not really feel threatened by this comment, that is irrelevant. A rational jury would have to find it was, at the very least, insubordinate. Murray readily admits to making the statement and even apologized for it as "unnecessary" the next day. (*Id.* at 96.) Whether Sauter is bigger than Murray, where he was in physical proximity to Murray, and whether he was "shaking" afterward seem unimportant. Sauter says he was *shaken* (not shaking) after the comment and that he believed the potential for a physical altercation existed. (*Id.* at 476, 495, 499.) Plaintiff admits he made

---

**9.** Murray's statement to the psychologist is corroborated by the testimony of those who worked with him, his resistance to performing homecalls, and his lack of knowledge regarding the employees he was attempting to organize.

**10.** Plaintiff's attempt to prove his interpersonal skills were adequate for *this* job because they were adequate for the job of shop steward are misplaced. Different jobs may require different types of personality traits in varying degrees. *See Brinkley,* 180 F.3d at 610; *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316–17 (4th Cir.1993).

the statement, arguing only about the effect it did or did not have on other people.[11] Sauter's state of mind in the wake of this incident is not a material fact, and Murray does not, in any case, disprove Sauter's subjective feelings about the incident. There has been no evidence presented from which a trier of fact could reasonably conclude this incident did not play a role in the decision to terminate Murray as the Local contends.

The next day, Sauter recounted the events of the previous evening to his boss, Lowthers. It was Lowthers who actually made the decision to terminate Murray based on Lowthers' own personal interaction with Murray, input from his advisors regarding Murray, and the potential ramifications of not taking appropriate action in response to the threatening comment.[12] Lowthers says he discharged Murray because he was a marginally skilled organizer with a reluctance to perform assigned tasks who had now threatened his superior. (*See* Def.'s Mem., Ex. 1 at 318–23.) Certainly, Lowthers *could* have chosen to take other remedial action,[13] but it is not for this Court to pass judgment as a super-personnel office. *See Hawkins v. PepsiCo,* *Inc.,* 203 F.3d 274, 281 (4th Cir.2000). Murray may not be happy with the reasons proffered for his dismissal, but he has been unable to prove they are false and serve as a pretext for discrimination.

### D.

■ Perhaps most deleterious to Plaintiff's discrimination claims is his inability to show race was a factor in the decision to dismiss him. *See Dugan v. Albemarle County Sch. Bd.,* 293 F.3d 716, 722 (4th Cir.2002); *Brinkley,* 180 F.3d at 611 (holding evidence employer had treated employee callously is not enough for a Title VII claim—claim must be based on protected characteristic). It is plaintiff's burden in the third-step of *McDonnell Douglas* to prove the reasons offered by the defendant serve as pretext *for discrimination. See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (discussing the plaintiff's burden to prove discrimination); *E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846, 854 (4th Cir.2001) (same). Other than some evidence that Cash is a member of the NAACP and serves on the Minority

---

11. Along these lines, Plaintiff argues that Sauter would not engage in various activities were he *really* threatened by the comment (i.e. asking Murray into his office the next day to discuss it, allowing Murray to remain at work that week). But this argument is mistargeted. It is undisputed he made the insubordinate comment, and how well Sauter appeared to handle it is not relevant.

12. I find it unnecessary to address whether the Defendants should be the beneficiary of the "same actor" doctrine outlined in *Proud* because Defendants prevail without it. *See Proud v. Stone,* 945 F.2d 796, 797 (4th Cir. 1991).

13. Indeed, the Local subsequently changed its employee disciplinary practices in the wake of this lawsuit. Plaintiff spends a great deal of time attempting to show he was the a victim of disparate treatment based on events involving other employees and infractions that took place almost a year after his dismissal. In addition to the fact such evidence may be inadmissible as remedial action taken by the employer, *see* Fed.R.Evid. 407; *Dennis v. County of Fairfax,* 55 F.3d 151 (4th Cir.1995), this evidence has no probative value as to whether Murray was discriminated against when he was dismissed instead of reprimanded. If Plaintiff had examples of disparate treatment within the disciplinary process contemporaneous or prior to his dismissal, I might take a different view. *See Carter,* 33 F.3d at 461 (holding plaintiff must establish nonmembers of the class were similarly situated). Additionally, Plaintiff would need to prove the infractions of the other employees were comparably serious to his threat, which he has not done. *See Moore v. City of Charlotte,* 754 F.2d 1100, 1107 (4th Cir.1985).

Coalition for the union, the only "proof" of racial animus offered by Plaintiff are two statements allegedly made by Cash and overheard by Murray. One of these statements was allegedly made by Cash while commenting on including the Martin Luther King Jr. holiday in a bargaining proposal because "we've been held down too long." The other statement was ostensibly referring to Plaintiff when Cash was speaking to colleagues on the telephone and told them he did not want them to replace Murray on a campaign in Danville unless they had "another experienced white male" they could send. (*See* Def.'s Mem., Ex. 1 at 121–23.)

Assuming *arguendo* these uncorroborated statements were actually made and that Cash had a direct hand in the employment decisions of the Organizing Department, Plaintiff still fails to show his race played any role in the decision to dismiss him. As Defendants point out, if the statements were made, the first statement would have been in reference to an attempt to secure a federally recognized holiday for a racially mixed work force—not as a request for preferential treatment for African–Americans. The second statement, while obliquely referring to Plaintiff's race, displays absolutely no animus on the part of Cash toward any group of people and actually seems to credit Murray in particular with being "experienced" and difficult to replace on the campaign. No rational jury could find these statements rise to the level of remarks that would allow an inference that this employer discriminated against Murray on the basis of his race. *See Brinkley*, 180 F.3d at 608 (holding stray remarks with no nexus to the termination are insufficient to prove discriminatory animus).

### III.

 Based on events that took place after his dismissal, Murray also advances a state law defamation claim against the Local and Christian Sauter. Sauter allegedly made two statements to VanNess, the K-Mart employee, indicating Murray was terminated because he was "not a good organizer." Under Maryland law, to establish a prima facie case of defamation, the plaintiff must prove that: (1) the defendant made a defamatory communication to a third person; (2) the statement was false; (3) the defendant was at fault in communicating the statement; and (4) the plaintiff suffered harm. *See Thacker v. City of Hyattsville*, 135 Md.App. 268, 762 A.2d 172, 196 (Md.2000). Because Plaintiff would at most be able to prove only negligence on the part of the Defendant in making the statement (as opposed to malice) and is unable to produce any evidence of actual harm, Plaintiff's defamation claim must also fail.

### A.

As pointed out by the Fourth Circuit in its decision on the appeal of this case, the statement that Murray is "not a good organizer"—indicating an incapacity to perform his chosen occupation—is defamatory *per se* under recently established Maryland caselaw. *See Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 306 (4th Cir.2002); *Samuels v. Tschechtelin*, 135 Md.App. 483, 763 A.2d 209, 245 (2000). Plaintiff has presented evidence such a statement was communicated to a third party, Emma VanNess, and therefore meets the first element of the prima facie case.

 With that element fulfilled, Plaintiff must next prove the defamatory statement was false. Under Maryland law, the burden rests with the plaintiff to prove falsity, as opposed to with the defendant to prove the truth of the statement as an affirmative defense. *See Jacron Sales Co.*

*v. Sindorf,* 276 Md. 580, 350 A.2d 688, 698 (1976). Because it might be difficult to prove the falsity of a statement of mixed opinion—one involving undisclosed facts about the plaintiff that must be defamatory in order to justify the opinion—the plaintiff is given some latitude in proving falsity. *See Tschechtelin,* 135 Md.App. 483, 763 A.2d 209, 244 (quoting RESTATEMENT (SECOND) OF TORTS at § 566).

Defendants argue the statement cannot be false if I rule in favor of the Defendants on the discrimination claims and that collateral estoppel would therefore bar the defamation claim. This is not so. Defendants misconstrue the meaning of a ruling on summary judgment in a discrimination case. I have made no determination as to Murray's competence as an organizer. *Cf. Ritter v. Mount St. Mary's College,* 814 F.2d 986 (4th Cir.1987) (relying on findings of fact after a bench trial to apply collateral estoppel). Instead, I have simply held that no rational trier of fact could find, given the evidence proffered, that Murray had been discriminated against on the basis of his race. While that may also entail an implication that the *Defendants* did not believe Murray was a good organizer,[14] it says nothing about his actual abilities as an organizer. Thus, a genuine issue of material fact exists as to the falsity of the statement, which would require the assessment of a jury and could not be decided on summary judgment. *See Tschechtelin,* 763 A.2d at 247 (reserving determination of falseness for the jury, based on the record).

■ This, however, does not end the inquiry. The third element requires plaintiff to prove the defendant was at fault in communicating the statement. Fault can be shown by proving negligence by a preponderance of the evidence, or malice by clear and convincing evidence. *See Jacron Sales,* 350 A.2d at 700; *Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202, 217–18 (1995). If malice is proven by clear and convincing evidence, then the plaintiff does not need to prove damages—general damages are presumed. *See id.* (citing *Hearst Corp. v. Hughes,* 297 Md. 112, 466 A.2d 486 (1983)). If, however, the plaintiff can prove only negligence, then he must also prove actual harm. *See Massengill,* 661 A.2d at 217–18. Murray may or may not be able to prove negligence on the part of Sauter in communicating his opinion to VanNess, but based on the record before the Court, no rational trier of fact could find that the Defendant acted with malice in making this communication.

■ Malice is defined as making the statement while knowing of its falseness or with reckless disregard for the truth of the statement. *See Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129, 1133 (1978). Other than Plaintiff's bare allegation that Sauter made the statement knowing of its falsity, no evidence is presented to support a finding of malice. As stated previously, Sauter's opinion of Murray's abilities as an organizer is highly subjective. *See Tschechtelin,* 135 Md.App. at 554, 763 A.2d 209 (discussing the subjective nature of "poor performance"). Sauter had directly supervised Murray and had prompted the decision to terminate him based, in part, on his perception of Murray's abilities as an organizer. Sauter's opinion of Murray's abilities had been confirmed and echoed by others within management at the Local. Even viewing the evidence in the light most favorable to Plaintiff, a rational

---

14. Had the decision to terminate Murray been based entirely upon the threatening comment made to his supervisor, my decision would say even less about Murray's skills as an organizer or the Defendants' perception of those skills.

trier of fact would be compelled to find Sauter held a good faith belief that Murray was not a good organizer.

Sauter needed to explain the abrupt departure of Murray from the K–Mart campaign to the point person within the employee group, Emma VanNess.[15] Relying on his understanding of the decision made by the president of the Local and his own direct experience as Murray's supervisor, Sauter explained the dismissal in the most succinct fashion possible. Sauter did not act with a reckless disregard for the truth of the statement, and no rational trier of fact could find that he did. The malice standard cannot be met.

If Murray's claim were to proceed to the fourth element, it would have to be based on the negligence of the Defendant in making the statement because malice could not be proven in this case. Accordingly, Plaintiff would then be required to show actual harm as part of the prima facie case. *See Hearst,* 466 A.2d at 493. Even an action of defamation *per se* requires proof of damages if the standard of fault is merely negligence. *See Tschechtelin,* 763 A.2d at 245. Plaintiff has presented no evidence of such harm, and his claim must therefore fail.

A separate order is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 31st day of October 2002

ORDERED that

1. Defendants' motion for summary judgment is granted;

2. Plaintiff's cross-motion for summary judgment is denied;

3. Judgment is entered for the Defendants; and

4. This case is closed.

---

**15.** In light of my rulings on the defamation claim, I need not decide whether the communication to VanNess falls within the scope of the qualified immunity governing employer-employee relations. *See generally Massengill,* 661 A.2d at 219 n. 11 (discussing common law privilege extending to communications between an employer and employee).