Ronald TRAMMELL,

v.

### BALTIMORE GAS & ELECTRIC CO., et al.

No. CIV.A. CCB–02–226.

United States District Court, D. Maryland.

Aug. 28, 2003.

Lori B. Kisch, Jessica Caspe, Timothy
B. Fleming, Gordon, Silberman, Wiggins

and Childs PC, Washington, DC, Grant E. Morris, Law Offices of Grant E. Morris, Washington, DC, for Plaintiff.

John L. Wood, Baltimore, MD, for Defendants.

## MEMORANDUM

BLAKE, District Judge.

Now pending before the court is a motion for summary judgment brought by defendants Baltimore Gas & Electric Company and Constellation Energy Group ("Defendants" or "BGE"). This matter has been fully briefed and no hearing is necessary. Local Rule 105.6. A description of the case is as follows.

Plaintiff Ronald Trammell ("Plaintiff" or "Trammell"), an African–American male, was employed by BGE from approximately 1972 until September 2000. While he occupied various positions during his tenure at BGE, at all times relevant to this litigation, Trammell worked as a material handler on the night shift at BGE's Rutherford Business Center. In his memorandum, Trammell indicated that he "was the only African–American material handler on the midnight shift," as his co-workers included Richard Ullman, Robert Kloch, Ronald Lubinski, and Michael Wilson (the lead material handler), all of whom are Caucasian males. (Pl.'s Opp. Mem. at 2.) At his deposition, however, Trammell stated that his co-workers on the night shift also included Sean Stepney, Mike Balzano, James McVay, and Bill Edison (id. at Ex. 1, Trammell Dep., at 62–63); it appears from the record that Stepney and McVay are African–American males. (Defs.' Mem. at Ex. 2, McKim Dep., at 76–77.) The night shift was supervised by John Trabert, a Caucasian male, until approximately March 2000 when David McKim, also a Caucasian male, assumed the supervisor position.[1] (Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 62–65; Defs.' Mem. at Ex. 1, Suehle Aff., at ¶ 2.) McKim reported to Joseph Suehle, the Director of Material Distribution. (Defs.' Mem. at Ex. 1, Suehle Aff., at ¶ 2.)

Trammell's employment with BGE was terminated on September 20, 2000. (Id. at Ex. 16.) According to BGE, the "decision was based on [Trammell's] three unexcused absences dated July 12, 2000, August 18, 2000, and September 13, 2000."[2] (Id.) The gravamen of Trammell's complaint, however, is that the defendants discriminated against him on the basis of race during his tenure at BGE, culminating in the decision to terminate his employment. (Compl.) Therefore, a discussion of BGE's policies, Trammell's attendance record, and Trammell's allegations of racial discrimination ensues.

The BGE Employee Handbook[3] states that employees shall "[c]hoose [their] vacation dates, subject to [their] supervisor's advance approval, based on operating con-

---

1. McKim also supervised the second shift, which included some African–American employees, including a man named Trillane Hill, as will be discussed later. (Defs.' Mem. at Ex. 2, McKim Dep., at 76–77.)

2. The defendants' answers to interrogatories, however, state that Trammell "was terminated for violating Company policy regarding unexcused absences on several occasions," including one on or about May 2, 2000. (Pl.'s Opp. Mem. at Ex. 12, Defs.' Answers to Interrogs., at 2–3.)

3. The plaintiff and defendants attached various excerpts of the BGE Employee Handbook to their papers. (See Defs.' Mem. at Ex. 4A; Pl.'s Opp. Mem. at Ex. 9.) Although one version appears to be an online copy, both list an effective date of May 17, 1999. (Id.) Trammell indicated at his deposition that he possessed a hard copy of the handbook and had access to the online version. (Defs.' Mem. at Ex. 3, Trammell Dep., at 126–27.)

ditions." (Defs.' Mem., Ex. 4A at 00602.) Similarly, if employees will be absent from or late to work because of sickness or other unexpected occurrence, such as "an auto accident on the way to work," they shall "[c]ontact [their] supervisor ... [and][g]ive such notice at least one-half hour before [their] normal starting time if absence relief must be arranged, and within one-half hour after [their] normal starting time in all other situations."[4] (Pl.'s Opp. Mem., Ex. 9 at 00473.) The record reveals that material handlers from the second shift are asked to stay and provide coverage when night shift employees are absent or late and when operating conditions so demand. (*See, e.g.,* Defs.' Mem. at Ex. 1, Suehle Aff., at ¶ 5; *id.* at Ex. 4, McKim Aff., at ¶¶ 4–5; *see also id.* at Ex. 3, Trammell Dep., at 123.) Accordingly, it is imperative that material handlers provide advance notice of any absence or lateness, according to the defendants, so that the supervisor or lead material handler may determine whether coverage from the second shift is necessary. (*Id.* at Ex. 1, Suehle Aff., at ¶ 5; *id.* at Ex. 4, McKim Aff., at ¶¶ 4–5.) Significantly, Trammell himself testified that he understood employees were required to call one-half hour before the beginning of their shift to request any time off. (*Id.* at Ex. 3, Trammell Dep., at 91.)

The BGE Employee Handbook also stipulates that "[a]ny time .... absence from work is unauthorized ... [it is] considered to be ... an unexcused absence. This includes situations in which [employees] failed to properly notify [their] supervisor of [their] absence." (Defs.' Mem., Ex. 4A at 00600.) Failure to properly report an absence or lateness "is in itself a cause for Corrective Action unless it is later determined, in [the] supervisor's judgment, that it was considered impractical ... to have done so (such as being hospitalized, involved in an auto accident on the way to work, etc.)." (Pl.'s Opp. Mem., Ex. 9 at 00473.) The handbook provides that a supervisor should issue a Corrective Action Report ("CAR"), place the employee on probation, withhold pay for the period of unexcused absence, and warn the employee of the potential consequences of further infractions for the first and second unexcused absences within a one-year period. (Defs.' Mem., Ex. 4A. at 00600.) Upon the third unexcused absence, the supervisor should "[s]uspend the employee with a recommendation for discharge." (*Id.*) If an employee has "demonstrated a pattern of excessive absence and/or lateness or ... experienc[ed] other work performance problems, [the] supervisor has the discretion to take more serious corrective action, as appropriate." (*Id.*)

The record includes reports and testimony concerning Trammell's attendance record and, specifically, various instances when he purportedly violated BGE's em-

---

**4.** The BGE Employee Handbook anticipates that supervisors will establish their own procedures for requesting leave. (*See, e.g.,* Defs.' Mem., Ex. 4A at 00601) ("Your supervisor is responsible for ... taking appropriate corrective action ... when you fail to report as scheduled. This also includes taking appropriate corrective action when you fail to report for Call–Ins in accordance with procedures established by your supervisor.") McKim testified that pursuant to his own policy, employees were required to call one-half hour before the beginning of the shift "for sickness or something that is going to cause [the employee] to be late." (Defs.' Mem. at Ex. 2, McKim Dep., at 104–05.) In order to request a previously unscheduled vacation day, employees were obligated to call at least three hours prior to the beginning of their shift. (*Id.*) Trammell testified that he was generally unaware of McKim's personal policies; Trammell's understanding, rather, was that employees were required to call one-half hour before the beginning of their shift to request any time off. (Defs.' Mem. at Ex. 3, Trammell Dep., at 91.)

ployment policies. The first such instance occurred on or about December 30, 1997.[5] (Defs.' Mem. at Ex. 5.) According to a CAR dated January 13, 1998 and signed by Trammell,[6] the plaintiff was scheduled to report to work at 11:00 p.m. (*Id.*) At 11:10 p.m., Trammell called and notified then-lead material handler, Richard Ullman, that he was on his way to work. (*Id.*) There was no further contact from Trammell until 4:20 a.m., when he called, informed his co-worker that he was at the hospital, and requested sick leave, which was subsequently denied. (*Id.*) The report also notes that "[i]ncluding this unexcused absence and most recent absence frequency of 1/2/98, [Trammell] has now accumulated four full and one partial absence frequency during the last 52 week cycle which perpetuates a pattern of poor attendance over the last three years requiring informal warnings on 8/23/96 and 2/27/97." (*Id.*) As a result, Trammell "disrupt[ed] normal operations and place[d] an unnecessary burden on co-workers," according to the report. (*Id.*) Ullman substantiated the report at his deposition when he testified that Trammell frequently violated BGE's employment policies in that time frame and that he, as lead material handler, spoke with Trammell about proper procedures. (Defs.' Mem. at Ex. 6,

Ullman Dep., at 62–67.) Ullman stated that he reluctantly reported the infractions to supervisor John Trabert because "[a]t that point I felt I was being taken advantage of some ... You kind of tried to not get somebody in hot water ... as co-workers ... but at some point I had to do my job without fear of my own problem." (*Id.* at 64–65.) Ullman also testified that Trammell was the only material handler on their shift who had repeated attendance problems. (*Id.* at 67–69.)

On or about May 2, 2000, according to reports drafted by McKim, Trammell called Michael Wilson, the lead material handler, at 10:35 p.m., five minutes after the shift began, and requested a previously unscheduled vacation day because he was at the airport picking up his mother. (Defs.' Mem. at Ex. 7, 9.) Wilson informed him that operating conditions required his presence and, thus, he instructed Trammell to report to work as soon as possible. (*Id.*) Trammell arrived at work more than two hours later. (*Id.*) Trammell was permitted to leave work early, however, because the shift completed its responsibilities earlier than anticipated. (*Id.* at Ex. 7.) McKim drafted a CAR in connection with this incident (*id.* at Ex. 9), but Suehle advised him to perform an informal "Coaching and Counseling" instead.[7] (*Id.*

---

**5.** The plaintiff contends that events in this time frame are irrelevant because BGE's disciplinary procedures pertain to unexcused absences that fall within a one-year period only. (Pl.'s Opp. Mem. at n. 11, n. 17.) Insofar as these past events demonstrate a "pattern of excessive absence and/or lateness," however, they are relevant according to the explicit terms of the BGE Employee Handbook. (Defs.' Mem., Ex. 4A at 00600.) In addition, these past events are relevant to the issue of pretext.

**6.** Despite the fact that Trammell signed the CAR, he testified at his deposition that he does not recall the underlying incident or

receiving the CAR. (Defs.' Mem. at Ex. 3, Trammell Dep., at 116.)

**7.** At approximately 9:00 p.m. on the same day, co-worker Ronald Lubinski called work seeking a previously unscheduled vacation day. (Defs.' Mem. at Ex. 4B.) Because McKim felt that the workload could be managed without Lubinski, McKim approved his request. (*Id.* at Ex. 4, McKim Aff., at ¶¶ 6–7; *id.* at Ex. 2, McKim Dep., at 103–06.) Although Lubinski called work approximately one and one-half hours prior to the beginning of the shift, he received a "Coaching and Counseling" for failure to adhere to McKim's personal policy of calling at least three hours before the beginning of the shift to request a

at Ex. 2, McKim Dep., at 120–22; *id.* at Ex. 7.) According to McKim and Wilson, they met with Trammell, reviewed the Coaching and Counseling report, and advised him of proper procedures pertaining to requesting leave. (*Id.* at Ex. 2, McKim Dep., at 124–26; *id.* at Ex. 8, Wilson Aff., at ¶ 3.) They also testified that Trammell did not sign the Coaching and Counseling report.[8] (*Id.* at Ex. 2, McKim Dep., at 130; *see also id.* at Ex. 7; *id.* at Ex. 8, Wilson Aff., at ¶ 3.)

Trammell stated that he never received a Coaching and Counseling session in connection with the May 2000 incident; in fact, Trammell testified that he saw the Coaching and Counseling report for the first time at his deposition. (Defs.' Mem. at Ex. 3, Trammell Dep., at 128–32.) Trammell, however, did recall the incident. (*Id.*) According to Trammell, he placed the call requesting a vacation day from a pay phone at the airport at approximately 10:35 p.m. (*Id.* at 135.) Although Trammell admitted that he knew he was expected at work that night and that it took between thirty and forty-five minutes to drive from his home to the airport, he offered no explanation as to why he failed to call work before he left for the airport. (*Id.* at 132–35.)

According to a CAR drafted by McKim and signed by Trammell, on or about July 13, 2000, Trammell called McKim at 10:25 p.m. to inform McKim that he would be one hour late. (Defs.' Mem. at Ex. 11.) There was no further contact from Trammell until almost 5:00 a.m., when he called, spoke with Wilson, and asked for vacation leave for the day. (*Id.*) The CAR states that Trammell was advised of the potential consequences of future infractions and of the need "to give proper notification when he is requesting time off for unexpected reasons." (*Id.*) Consistent with the BGE Employee Handbook, Trammell also was placed on probation for three months. (*Id.; see also id.* at Ex. 2, McKim Dep., at 133–37.)

Trammell stated that he did not remember the July 2000 incident itself, but he did recall receiving a CAR, meeting with McKim to discuss it, and signing it. (Defs.' Mem. at Ex. 3, Trammell Dep., at 136–40.) In addition, while Trammell recalled the portions of the CAR indicating a formal warning was given and a three-month probation was commenced, he testified that the language, "Warned [Trammell] that the next unexcused absence may result in six months' probation and a 5 percent reduction in pay," was not typed on the report when he signed it. (*Id.* at 137–38; Defs.' Mem. at Ex. 11.)

According to correspondence and a CAR drafted by McKim, on or about August 10, 2000, Trammell neither reported to work on time nor notified McKim of his anticipated tardiness. (Defs.' Mem. at Ex. 12–13.) Trammell arrived at work more than

---

previously unscheduled vacation day. (*Id.* at Ex. 4, McKim Aff., at ¶¶ 6–7; *id.* at Ex. 4B.) Given Lubinski's absence, Wilson believed that operating conditions required Trammell's presence when Trammell called at 10:35 p.m. seeking a previously unscheduled vacation day and, hence, Wilson denied his request (*id.* at Ex. 8, Wilson Aff., at ¶ 3); as stated, because the workload was lighter than Wilson originally estimated, Trammell was permitted to leave work early. (*Id.*)

8. Although a Coaching and Counseling report is not a CAR, the BGE Employee Handbook provides that if an employee refuses to sign a CAR, "a third party (generally another supervisor) is asked to witness that the corrective action was administered." (Pl.'s Opp. Mem., Ex. 9 at 00484.) In this case, both McKim and Wilson signed the Coaching and Counseling report and testified that they were present when it was given to Trammell. (Defs.' Mem. at Ex. 7; *see also id.* at Ex. 8, Wilson Aff., at ¶ 3; *id.* at Ex. 2, McKim Dep., at 124–25.)

four hours late and, as a result, personnel from the second shift were asked "to work overtime to cover for [Trammell's] absence." (*Id.* at Ex. 13.) The CAR states that McKim gave Trammell a formal warning, placed him on probation for six months, reduced his pay, and warned him that "the next unexcused absence may result in his discharge from BGE." (*Id.*) Trammell did not sign the CAR. (*Id.*) Although McKim only signed the CAR, Wilson testified that he witnessed a meeting between McKim and Trammell, during which they discussed the incident and the CAR, and Trammell thereafter refused to sign the report. (*Id.* at Ex. 8, Wilson Aff., at ¶ 5.)

Trammell testified that he did not recall an August 2000 incident or a meeting with McKim and Wilson where the incident and a CAR were discussed. (Defs.' Mem. at Ex. 3, Trammell Dep., at 147–49.) In fact, Trammell stated that he had not seen the August 2000 CAR before his deposition. (*Id.*)

On or about September 13, 2000, according to correspondence and a CAR drafted by McKim, Trammell called work at approximately 11:25 p.m., more than one hour after the beginning of his shift, and informed McKim that he would report to work in one-half hour. (Defs.' Mem. at Ex. 15–16.) When asked why he did not call earlier, Trammell replied that he went to New York for the day and his train had just arrived at Baltimore's Penn Station. (*Id.* at Ex. 16.) McKim requested that Trammell report to work and bring his train ticket or other documentation confirming his trip. (*Id.*) Trammell never reported to work or called McKim again that night. (*Id.*) According to the CAR, Trammell met with Suehle and Trabert on Sep-

tember 19, 2000, and explained that "he tried to go back into the train station to get documentation that would verify his trip, but the train station was locked." (*Id.*) Trammell added that he was "frustrated" and, thus, decided not to report to work. (*Id.*) Management, through independent investigation, discovered that the doors to Penn Station are not locked until 12:00 a.m., and the CAR references a provision of the BGE Employee Handbook pertaining to the falsification of reasons for absence or tardiness (*Id.*) Noting that it was the "third Corrective Action in the past two months," the CAR states that Trammell was thereby suspended with a recommendation for discharge. (*Id.*) Trammell did not sign the CAR.[9] (*Id.*)

Trammell's account of the September 2000 incident is substantially similar to the one offered by the defendants. Trammell stated that he left Baltimore at approximately 11:30 a.m. that day to visit his aunt in Hackensack, New Jersey. (Defs.' Mem. at Ex. 3, Trammell Dep., at 151–59.) His return train departed New York at approximately 8:00 p.m., and Trammell conceded he knew at that time he would be late for work. (*Id.* at 161.) Nevertheless, he did not call from New York because he believed, erroneously, that he "could probably call from the train." (*Id.* at 161–62.) Trammell admitted that his train arrived in Baltimore after the beginning of his shift and that he called work only after he arrived at the station. (*Id.* at 163–65.) He recalled McKim's request for a train ticket, but speculated that he "tore it up." (*Id.* at 168–69.) Since he paid for the ticket with cash, Trammell stated, he returned to Penn Station to obtain some documentation of his trip, but the doors were locked. (*Id.* at 167–69.) "[O]ut of

---

**9.** The CAR states: "Employee could not be reached on 9/21/00 and 9/22/00 to discuss this document. Consequently, this document was mailed to the employee's home." (Defs.' Mem. at Ex. 16.)

frustration," Trammell decided to stay home from work that night. (*Id.* at 170–71.) Trammell recalled meeting with Suehle and Trabert on September 19, 2000, and having the opportunity to discuss the incident with them. (*Id.* at 180–81.)

As stated, Trammell's employment with BGE was terminated on September 20, 2000.[10] (Defs.' Mem. at Ex. 16.) By letter dated October 3, 2000, BGE confirmed that Trammell requested a peer review hearing, which was scheduled for October 24, 2000. (*Id.* at Ex. 18.) Attached to the letter was an appeal form for Trammell's completion, as it was his responsibility "to state for the panel why [he] believe[d] the level of corrective action taken was not appropriate." (*Id.*) Trammell's appeal form states that management "would not give [him] days [he] want[ed]" and that he lost his job because he "was late ... but [no one] would give [him] time." (*Id.*) After the hearing, the peer review panel concluded that the level of corrective action administered was appropriate and, thus, it upheld the decision to terminate Trammell. (*Id.*)

Trammell commenced this suit pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e, *et seq.*) ("Title VII"), alleging that he suffered racial discrimination during his tenure at BGE, culminating in his wrongful termination. (Compl.; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 5–9.) According to Trammell, he was treated differently from his Caucasian co-workers during his employment at BGE in the following three ways: he was denied a requested training course (Pl.'s Opp. Mem. at 30–31; *id.* at Ex. 1, Trammell Dep., at 243–46; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 7); he received lower bonuses than his Caucasian co-workers for the years 1997 through 1999 (Pl.'s Opp. Mem. at 31; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 9); and his peer review hearing was discriminatory (*id.* at 12–14, 31–32; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6–7; *see also* Compl. at ¶¶ 8–13.)[11] In addition, Trammell alleges that BGE supervisors subjected him to harsher discipline than his Caucasian co-workers; while many material handlers were late to or absent from work, Trammell alleges that only he received CARs and was terminated for such behavior.[12] (Pl.'s Opp.

---

10. Following Trammell's termination, there have been three openings for material handler trainee positions; McKim hired African–Americans for two of these positions. (Defs.' Mem. at Ex. 4, McKim Aff., at ¶ 9.)

11. Trammell initially contended that he was treated differently from his Caucasian co-workers during his employment at BGE because supervisors refused to approve any of his requests for unscheduled vacation days, while his co-workers received approval routinely. (Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 82–85; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 9.) Trammell did not pursue this argument in his opposition memorandum. (*See* Pl.'s Opp. Mem.) In any event, Trammell was unable to offer any specific details regarding the purported denials of his requests (*see* Pl.'s Opp. Mem. at Ex. 1, Tram-

mell Dep., at 83–85), and McKim testified that he never denied requests for vacation days that were properly made by Trammell. (Defs.' Mem. at Ex. 2, McKim Dep., at 201–02; *see also id.* at Ex. 3, Trammell Dep., at 96–97 (Trammell testifying that, "If I called at 10:30 to say I needed vacation, I could never get it. But he's telling this man if he called him early, he could have got it. So what's the difference?").)

12. The parties dispute whether this claim is appropriately characterized as one for wrongful termination. (*See* Defs.' Mem.; Pl.'s Opp. Mem.; Defs.' Reply Mem.; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6.) The plaintiff's opposition memorandum makes clear that the claim charges disparate discipline only. (*See, e.g.,* Pl.'s Opp. Mem. at 18–22) (stating that the "relevant inquiry is

Mem. at 14–27; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6; Compl. at ¶ 11.) To support his argument that he was disciplined more severely because of his race, Trammell alleges that he suffered discrimination in the following ways during his employment at BGE: Trammell's co-workers were permitted to leave work early, particularly on days preceding scheduled vacations, while he was not (Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 70–73); Trammell was given a disproportionate share of the work (*id.* at 76–77, 201–02); McKim singled out Trammell and prohibited him from using his office during breaks (*id.* at 87–88); and, unlike his Caucasian co-workers, Trammell was required to ask permission to use the restroom (*id.* at 202; *see also* Pl.'s Opp. Mem. at 27–30.) [13]

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judg-

ment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences in a light most favorable to the nonmoving party," *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

■ As stated, the plaintiff claims that he was subject to race discrimination in violation of Title VII and 42 U.S.C. § 1981. Because he did not present any direct evidence of race discrimination, he proceeded under the burden-shifting scheme articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Murray v. United Food & Commercial Workers Union, Local 400,* 229 F.Supp.2d 465, 469 n. 2 (D.Md.2002) (stating that in the context of employment dis-

---

'whether employees ... involved in or accused of the same or similar conduct ... are disciplined in different ways' ") (citation omitted).

**13.** Trammell did not bring a hostile work environment claim against the defendants. (*See* Compl.; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs.; Pl.'s Opp. Mem.) Rath-

er, as stated, Trammell contends that these alleged instances of discrimination are relevant to the issue of pretext. (Pl.'s Opp. Mem. at 29–30.) The court assumes, without deciding, that a hostile work environment claim would fail as a matter of law. *See, e.g., Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 183–84 (4th Cir.2001).

crimination, section 1981 claims are analyzed under a proof scheme similar to Title VII claims). As a general matter, to establish a prima facie case of employment discrimination, the plaintiff must show that: "(1) [he] is a member of a protected class; (2)[he] was performing [his] duties in a satisfactory manner; (3)[he] was subjected to an adverse employment action; and (4)[he] was treated differently [from] similarly situated individuals outside of [his] protected class." *Nichols v. Harford County Bd. of Educ.*, 189 F.Supp.2d 325, 340 (D.Md.2002); *see also Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649–50 (4th Cir.2002) (holding that in order to establish a prima facie case of discriminatory denial of training, the plaintiff must show that: "(1) the plaintiff is a member of a protected class; (2) the defendant provided training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination"); *Bazemore v. Friday*, 751 F.2d 662, 670 (4th Cir.1984), *aff'd in part, rev'd in part on other grounds*, 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (finding that in order to establish a prima facie case of discrimination in pay, the plaintiff must show that: (1) he is a member of a protected class; (2) he is as qualified as employees not of the protected class; and (3) he was paid less than other comparably qualified employees); *cf. Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993) (holding that in order to establish a prima facie case of disparate discipline, the plaintiff must show that: (1) he is a member of a protected class; (2) "that the prohibited conduct in which he engaged was comparable in

seriousness to misconduct of employees outside the protected class;" and (3) "that the disciplinary measures enforced against him were more severe than those enforced against those other employees"). If the plaintiff establishes a prima facie case, the burden of production is placed on the defendant to state a legitimate, non-discriminatory reason for the adverse employment action. *Nichols*, 189 F.Supp.2d at 340. If the defendant articulates such an explanation, the burden returns to the plaintiff to show that the proffered reason is a pretext for impermissible discrimination. *Murray*, 229 F.Supp.2d at 470. Although burden of production shifts, the plaintiff retains the burden of persuasion throughout all stages, *see Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir.1996), and the plaintiff must present admissible evidence that is more than self-serving opinions or speculation. *See Causey v. Balog*, 162 F.3d 795, 801 (4th Cir.1998); *McCain v. Waste Mgmt., Inc.*, 115 F.Supp.2d 568, 574 (D.Md.2000). In sum, the *McDonnell Douglas* framework is not a rigid or mechanized scheme, but rather " 'a means to fine-tune the presentation of proof and, more importantly, to sharpen the focus on the ultimate question—whether the plaintiff successfully demonstrated that the defendant intentionally discriminated against [him].' " *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 611 (4th Cir.1999) (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir.1995)).

■ With regard to his training claim, Trammell asserts that the defendants discriminated against him on the basis of race when they denied his request for an advanced training course.[14] (Pl.'s Opp. Mem.

---

**14.** Trammell initially asserted that he was also denied basic skills training in late 1999. (Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 7.) At his deposition, however, Trammell explained that he did not pursue this training course, designed to orient employees with a new computer system, because BGE

at 30–31; *id.* at Ex. 1, Trammell Dep., at 243–47.) Trammell, however, did not establish that BGE provided such training to material handlers or that he was eligible for it. Significantly, it does not appear that any of Trammell's former co-workers attended the training course requested by Trammell. (*Id.* at Ex. 1, Trammell Dep., at 243–47.) In addition, McKim testified that there is no entitlement to formal training and that supervisors must determine an employee's need for certain skills, ability to understand the material, and potential for advancement in the company before approving any training courses. (*Id.* at Ex. 2, McKim Dep., at 193–200.) The only detail that Trammell could recall about the course he requested to attend was that "it was to better yourself as far as your speech and handwriting and different things." (*Id.* at Ex. 1, Trammell Dep., at 244.) Trammell did not even aver, however, that he needed improvement in those areas or that he desired a new position for which those skills were useful. (*See id.* at 243–47.) The only support for the plaintiff's theory that he was denied this training on the basis of race is the fact that one Caucasian employee named Pat Maraugha received the training requested by Trammell. (*Id.* at 246; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 7.) Maraugha, however, did not occupy the same position at BGE as did the plaintiff.[15] (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 193.) Accordingly, Trammell has presented no evidence whatsoever suggesting that he was denied training "under circumstances giving rise to an inference of dis-

crimination," which is required to establish a prima facie case of discriminatory denial of training. *See Thompson,* 312 F.3d at 649–50.

◼ Trammell also charges that he received lower bonuses or Result Incentive Awards ("RIAs") for the years 1997 to 1999 on the basis of race. As support for this proposition, Trammell attached his annual performance evaluations, his RIA reports, and the RIA reports of Kloch and Ullman. (Pl.'s Opp. Mem. at Ex. 6, 15–17.)[16] During the 1997 to 1999 time frame, Trammell received scores of four or five in all areas on his performance evaluations (five being "full proficiency"), and yet his RIAs were somewhat lower than Kloch's and Ullman's. (*Id.*) Significantly, however, the plaintiff did not attach Kloch's or Ullman's performance evaluations, or the evaluations and RIA reports of any other former co-workers from his shift (such as Lubinski, Stepney, Balzano, McVay, Edison, or Wilson) or from other shifts under McKim's or Trabert's supervision (such as Hill). According to Suehle, RIAs are "determined in part by the level of contribution of an individual employee." (Defs.' Reply Mem. at Ex. 1, Suehle Aff., at ¶ 3.) Since a "level [five] on a job proficiency ... means [only] that an employee is adequately meeting all of the requirements of his job ... several employees who are all at a level [five] may be treated differently under the RIA system." (*Id.* at ¶¶ 2–3.) Trabert testified that Trammell received lower RIAs than Kloch and Ullman "because Mr. Trammell's perform-

---

delayed the system's implementation. (*Id.* at Ex. 3, Trammell Dep., at 246–47.)

**15.** McKim described Maraugha's position as "a material handler driver, a slasher. It is a job on the midday shift where a gentleman works in the warehouse and drives a truck." (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 193.) At his deposition, Trammell did not

identify Maraugha as a former co-worker (*see* Defs.' Mem. at Ex. 3, Trammell Dep., at 62–63), or mention his name apart from his testimony regarding training.

**16.** The contents of Exhibits 15, 16, and 17 were placed under seal by Order of this court on February 11, 2003, to protect the personal information of third parties.

ance and contribution was [sic] not as good as those Material Handlers [sic]." (Defs.' Mem. at Ex. 20, Trabert Aff., at ¶ 5.) Accordingly, without having submitted the performance evaluations of Kloch or Ullman (or any other material handler), the plaintiff did not show that he was as qualified as they were. *See Bazemore,* 751 F.2d at 670. In addition, the plaintiff "has presented no admissible statistical data, which is often essential with such claims." *McCain,* 115 F.Supp.2d at 576 (citing *Carter v. Ball,* 33 F.3d 450, 456 (4th Cir.1994)); *see also Obi v. Anne Arundel County,* 142 F.Supp.2d 655, 674–75 (D.Md.2001). The plaintiff, therefore, did not establish a prima facie case of race discrimination with respect to the RIAs, and in any event, did not rebut BGE's legitimate, non-discriminatory reason for assessing the bonuses as it did.

██ The plaintiff further submits that he was discriminated against on the basis of race in connection with his peer review hearing.[17] (Pl.'s Opp. Mem. at 31–32.) In sum, Trammell contends that the peer review hearing was unfair because he was not permitted witnesses to testify on his behalf and the panel never considered whether BGE discriminated against him on the basis of race. (*Id.;* Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6–7.) Marilyn Gibson, BGE human relations employee and the facilitator of Trammell's hearing,[18] testified that Trammell's five-member panel consisted of three non-supervisors and two supervisors, three of whom, the defendants proffer, are African–Americans. (*Id.* at Ex. 5, Gibson Dep., at 21; Defs.' Mem. at 26.) Gibson explained that upon reading the appeal form and listening to the appellant, the panel members determine whether they would like to hear from witnesses. (Pl.'s Opp. Mem. at Ex. 5, Gibson Dep., at 26–27, 30, 52–53.) As stated, on Trammell's appeal form, he merely claimed that management would not give him time off and that he was fired because he was late to work. (Defs.' Mem. at Ex. 18.) Importantly, Trammell did not mention racial discrimination on his appeal form (*id.*); it is not surprising, therefore, that race was never discussed at his hearing. (Pl.'s Opp. Mem. at Ex. 5, Gibson Dep., at 73.) Moreover, the plaintiff does not present any evidence that his own hearing deviated from the standard procedure, as memorialized in the BGE Employee Handbook and affixed by the plaintiff to his memorandum. (*Id.,* Ex. 9 at 00481–00482; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 8.) Given the foregoing, the court concludes that Trammell has not submitted any evidence suggesting that he was treated differently from similarly situated individuals outside his protected class or that BGE discriminated against him on the basis of race in conducting his peer review hearing.

---

17. Trammell states in his complaint and answers to interrogatories that his disparate treatment claims are based, in part, on his peer review hearing. (Compl. at ¶ 12; Defs.' Mem. at Ex. 14, Pl.'s Answers to Interrogs., at 6–7.) In Trammell's opposition memorandum, however, after contending that his peer review hearing was discriminatory, he submits that he "does not contend that Defendants' conduct with respect to the hearing constitutes a separate claim of discrimination, for which Plaintiff seeks separate relief." (Pl.'s Opp. Mem. at 32.) Given the uncertain-ty of Trammell's posture, the court will address his arguments regarding his peer review hearing as if they constitute claims or some part thereof.

18. Gibson is African–American. (Pl.'s Opp. Mem. at Ex. 5, Gibson Dep., at 32.) The facilitator, however, does not vote and is only "responsible to keep the panelists focused to ensure a timely decision." (*Id.* at Ex. 9; *see also* Defs.' Mem. at Ex. 17, Gibson Dep., at 11, 20, 46.)

Finally, Trammell alleges that he was subject to harsher discipline than his Caucasian co-workers for lateness and absence from work. Trammell attempted to establish the second element of the prima facie case, "that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class," *Cook*, 988 F.2d at 511, through reference to some of his former co-workers.[19]

According to Trammell, Ullman[20] was late to work "a couple times," once because he was involved in a car accident. (Defs.' Mem. at Ex. 3, Trammell Dep., at 237–39.) Trammell did not know how late Ullman was on these occasions or, importantly, whether he called his supervisor in advance to receive approval for leave. (*Id.* at 238–39.) In fact, Ullman testified that it was his practice to call his supervisor several hours before the beginning of his shift to inform him of his anticipated lateness or absence. (Pl.'s Opp. Mem. at Ex. 3, Ullman Dep., at 43–44, 46.) To the best of his recollection, McKim testified that Ullman did not have any unauthorized absences. (*Id.* at Ex. 2, McKim Dep., at 101.)

Regarding Wilson, Trammell proffered that he called work one night during the shift and stated that he "might be in, might not;" Wilson purportedly did not report to work that night. (Defs.' Mem. at Ex. 3, Trammell Dep., at 225–27.) Trammell, however, did not even remember the year this incident allegedly occurred, nor did Trammell know if Wilson ever spoke with a supervisor to seek leave or why Wilson needed to take leave that night. (*Id.* at 226–27.) To McKim's recollection, Wilson did not have any unauthorized absences. (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 77–78.)

Trammell did not recall Lubinski having any attendance problems. (Defs.' Mem. at Ex. 3, Trammell Dep., at 236–37.) As stated, however, Lubinski received a Coaching and Counseling in May 2000 for seeking a previously unscheduled vacation day too soon before the beginning of the shift. (*Id.* at Ex. 4, McKim Aff., at ¶6; *see also id.* at Ex. 4B; Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 103–07.) Aside from that one instance, McKim did not recall Lubinski having any unauthorized absences or lateness. (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 106.)

Most of the testimony involving Trammell's former co-workers centered on Kloch. Trammell testified that Kloch was late to work "several times," once because he left his glasses at home, once because

---

**19.** Throughout his opposition memorandum, Trammell misconceives the nature of his own misconduct, noting once, for example, that "all of the white material handlers were late or had unscheduled absences during the relevant time frame, thus engaging in the same prohibited conduct." (Pl.'s Opp. Mem. at 21.) Trammell's employment was not terminated because he was late or had *unscheduled* absences, but rather because he had *unexcused* absences resulting from his failure to request leave sufficiently in advance of his shift. (Defs.' Mem. at Ex. 16.) The key inquiry, therefore, is whether Trammell's former co-workers timely requested and received their supervisor's authorization for their unscheduled leave—not whether they were ever late to or absent from work due to illness or other unexpected occurrence.

In addition, the record reveals that Trammell was absent for 416 hours of sick leave from January 1, 2000 until his termination in September 2000. (Defs.' Reply Mem. at Ex. 1, Suehle Aff., at ¶4.) It is undisputed that Trammell was not disciplined for taking sick leave, thus underscoring the important distinction between unscheduled and unexcused absences.

**20.** Ullman testified that he stopped working the night shift in approximately April 2000 and, hence, he only reported to McKim for a short period of time. (Defs.' Mem. at Ex. 6, Ullman Dep., at 20–21, 51.)

he lost his keys, and once because he was late returning from a golf outing. (*Id.* at Ex. 1, Trammell Dep., at 230–31, 233–36.) Trammell, however, did not remember the years these incidents allegedly occurred, nor did Trammell know if Kloch called work in advance and received approval for leave. (*Id.*) Kloch testified that, on one occasion, he called work soon before the shift began to notify his supervisor that he would be one-half hour late. (*Id.* at Ex. 4, Kloch Dep., at 42–44.) Otherwise, Kloch testified, it was his practice to call work at least one hour before the beginning of the shift to request leave. (*Id.* at 103–08.) To McKim's recollection, Kloch did not have any unauthorized absences or lateness. (*Id.* at Ex. 2, McKim Dep., at 84–85.)

Trammell also averred that Kloch was "famous" for reporting to work drunk on Wednesdays after his golf outings; according to Trammell, "he could hardly stand up" on certain occasions. (*Id.* at Ex. 1, Trammell Dep., at 231–39.) Ullman indicated, with equivocation, that he suspected Kloch might have come to work under the influence of alcohol. (*Id.* at Ex. 3, Ullman Dep., at 72–73) ("In my mind I may have [suspected Kloch had been drinking] ... but I never went and said 'You been drinking,' or something like that ... Lots of guys look like that".) Trammell never reported his suspicions to a supervisor, despite his knowledge that Kloch was operating heavy machinery at those times. (*Id.* at Ex. 1, Trammell Dep., at 231–32.) McKim testified that he never observed Kloch to be drunk at work, nor did anyone report such suspicions to him. (Defs.' Mem. at Ex. 2, McKim Dep., at 86–88.) Kloch admitted that he played golf approximately one Wednesday a month, but denied that he drank alcohol while golfing and that he ever came to work under the influence of alcohol. (Defs.' Reply Mem. at Ex. 19, Kloch Dep., at 121–25, 130–33, 140.) In addition, Kloch maintained that

he was never late to or absent from work because of his golf outings. (*Id.* at 132.)

McKim added that Trillane Hill, an African–American employee under his supervision on the second shift, also received a Coaching and Counseling for an attendance matter. (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 77–78.) While the record is devoid of details concerning Hill's Coaching and Counseling, McKim stated that Hill had "a number of personal problems involving his family" that caused him "to call [McKim] a number of times at the last minute or late, [to] say [he is] going to the hospital with [his] wife, this or that" and that McKim considered Hill's situation as "an extenuating circumstance" that he took into account in disciplining Hill. (*Id.* at 81.)

Considering the foregoing, the court concludes that Trammell has presented no evidence whatsoever "that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class." *Cook*, 988 F.2d at 511. Although "the reality [is] that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances," *id.*, none of Trammell's former co-workers was shown to have called work in an untimely fashion requesting leave, or otherwise to have had unauthorized absences or lateness, on numerous occasions in a one-year period. (*See also* Pl.'s Opp. Mem. at Ex. 1, Trammell Dep., at 150.) In fact, the record reveals that Lubinski, a Caucasian employee, also received a Coaching and Counseling for one infraction of the attendance policy, while Hill, an African–American employee, apparently only received one Coaching and Counseling for numerous such infractions. Although the allegations of Kloch's drinking have not been substantiated, even if

true, there is no evidence that McKim or any BGE supervisor actually knew of such conduct. Consequently, BGE had a reasonable basis for disciplining Trammell, but not Kloch, because it had evidence before it that Trammell had violated company policy. In sum, Trammell produced only self-serving testimony to support his claim that Caucasian employees similarly violated company policy, but were not disciplined as harshly as he. The second element of Trammell's prima facie case of disparate discipline, therefore, stands wholly unsupported.

In any event, Trammell offered no reliable evidence to demonstrate that BGE's rationale for disciplining Trammell, but not his former co-workers, was a pretext for discrimination. McKim denied giving preferential treatment to Caucasian employees and singling out Trammell by banning him from his office during breaks and requiring him to ask permission to use the restroom (Pl.'s Opp. Mem. at Ex. 2, McKim Dep., at 109–10); nor did any of Trammell's former co-workers substantiate his allegations. (*Id.* at Ex. 3, Ullman Dep., at 94–96; *id.* at Ex. 4, Kloch Dep., at 142–45.) The defendants' motion for summary judgment, thus, will be granted.

A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. defendants' motion for summary judgment (Docket No. 18) is **GRANTED;**

2. copies of this Order and the accompanying Memorandum shall be sent to counsel of record; and

3. the clerk of the court shall **CLOSE** this case.