UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DANIEL C. MURRAY,
             *Plaintiff-Appellant,*

v.

UNITED FOOD & COMMERCIAL
WORKERS UNION, LOCAL 400;
DONALD CASH; CHRISTIAN SAUTER,
             *Defendants-Appellees.*

No. 02-2387

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-98-2221-JFM)

Argued: May 4, 2004

Decided: June 9, 2004

Before WILLIAMS and TRAXLER, Circuit Judges, and
Pasco M. BOWMAN, Senior Circuit Judge of the
United States Court of Appeals for the Eighth Circuit,
sitting by designation.

---

Affirmed by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Paul Francis Evelius, WRIGHT, CONSTABLE &
SKEEN, L.L.P., Baltimore, Maryland, for Appellant. Francine Karen
Weiss, KALIJARVI, CHUZI & NEWMAN, P.C., Washington, D.C.,
for Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Daniel C. Murray brought this action against his employer, the United Food & Commercial Workers Union, Local 400 ("Local 400") and Donald Cash, alleging that he was terminated from his employment as a union organizer because of his race in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C.A. §§ 2000e - 2000e-17 (West 2003), and 42 U.S.C.A. § 1981 (West 2003). Murray also alleged a claim for defamation under Maryland law against Local 400 and its organizing director, Christian Sauter, arising from an alleged defamatory statement made by Sauter after Murray was terminated. The district court granted summary judgment to the defendants. We affirm.

I.

Local 400 is a labor organization that represents between 35,000 and 40,000 members, many of whom are employed in retail food stores. In 1980, Murray, who had been a member of Local 400 since 1974, began working for Giant Food, a Local 400 employer. As part of the collective bargaining agreement with employers, Local 400 members are allowed to take a leave of absence from their employment to assist with organizational campaigns. During his employment with Giant Food, Murray took such a temporary leave of absence on several occasions.

In January 1997, James Lowthers became president of Local 400, a position that gave him the sole authority to hire and fire union employees. Due to Local 400's unsatisfactory efforts in the past to unionize additional workplaces, one of Lowthers' initial goals was to build an effective organizing department and to recruit full-time organizers. Christian Sauter was placed in the position of organizing director of the department.

In February 1997, Lowthers offered Murray and two additional Local 400 members, Ralph Ramirez and Robin Williams, the opportunity to take a leave of absence and assume employment as full-time organizers for Local 400 on a one-year probationary basis. Murray is Caucasian, Ramirez is Hispanic, and Williams is African-American. In January 1998, Lowthers, after consulting with Sauter, promoted all three probationary employees to permanent status. Lowthers and Sauter are both Caucasian. During Murray's employment, several additional employees were also selected for probationary status, including Callie Lake, Steve Hedrick, Heath Fenner and Jennifer Leonard (all Caucasian), and Tony Perez (African-American).

Despite efforts to build the organizing department and train its staff, Lowthers remained unsatisfied with its performance. In February 1998, Lowthers asked his executive assistant, Donald Cash, to assist Sauter. Cash was a seasoned organizer and, because the organizing department was largely comprised of newly-hired, inexperienced organizers, Lowthers believed that Cash could provide needed assistance in Local 400's efforts to educate and train the new organizers. Cash is African-American.

In the next few months, each of the permanent organizers was assigned a campaign to lead. Murray was assigned to a K-Mart store campaign, which was shaping up to be quite promising based upon the initial efforts of K-Mart employee Emma Van Ness. According to Lowthers, however, Murray began to exhibit significant performance problems as the K-Mart campaign progressed, and a reluctance or inability to complete assigned and expected tasks associated with his responsibilities as the lead organizer. Both Sauter and Cash, who were following the progress of the K-Mart campaign, conveyed to Lowthers their concern about Murray's interpersonal and communication skills, a concern that Lowthers shared. Sauter and Cash were also concerned that Murray was not making enough "home calls" to K-Mart employees to shore up their support for the union.

Additional problems followed, most notably a conflict between Sauter and Murray over the preparation of organizing charts of the K-Mart campaign. As part of the organizational effort, the lead organizers held regularly-scheduled staff meetings to review campaign charts designed to demonstrate, in a snap-shot fashion, the progress and sup-

port for unionization of the target workplaces. The charts were to contain such information as the departments to be organized, the number of employees in each department, the names of the employees, the employees who had received a home call, the employees who had not yet been contacted, and indications of the employee's support. By looking at these charts, Local 400 officials could "get a flash . . . of what was going on and how the campaign effort was . . . progressing." J.A. 667.

It is undisputed that Murray had received training in the preparation of such charts during a prior organizational assignment in Virginia. It is also undisputed that, for the three weeks prior to the June 14 staff meeting, Murray had not prepared charts for the K-Mart campaign. When Sauter reported this to Lowthers, Lowthers told Sauter that Murray was "to put the charts together and get his work done because that was a basic part of organizing" and that he "didn't want to hear about it again." J.A. 436.

At the June 14 staff meeting, Murray presented his charts. According to Murray, after he had given a brief explanation of the charts, Cash told Murray that he was "not even going to tell [him] why the[ ] charts [were] unacceptable" and, instead, Cash asked Heath Fenner to tell him. J.A. 200. Fenner testified that the charts "didn't make a whole lot of sense" and "didn't pass the message on that charts usually are supposed to pass on, which is to . . . let you know where a program is at, how it stands." J.A. 860. Sauter described Murray's charts as "incomprehensible," J.A. 560, and considered them to be "the act of a rebel," because he knew, from the prior campaign, that Murray knew how to properly prepare the charts. J.A. 561. For his part, Murray does not contend that his work product was acceptable. Rather, he testified that Cash and Fenner unnecessarily berated and embarrassed him over the charts during the two-hour meeting and that, at the end of the meeting, Fenner was told to "fix [Murray's] charts" — a directive that Murray found "humiliating" because Fenner was junior to him and had only been organizing a few months. J.A. 203.

At approximately 5:00 p.m. on the evening of June 16, Murray and Fenner met in Sauter's office and reviewed the K-Mart charts that had been revised. After determining that they remained deficient, Murray

proceeded with yet another attempt to redo the charts. Both Sauter and Fenner were present. According to Murray, Sauter seemed angry because he was waiting to lock up and was constantly asking Murray if he was "done yet" because he "want[ed] to go home." J.A. 209. By about 8:00 p.m., Murray testified that he had "just had it," and told Sauter "this is enough" and "I'm going home now." J.A. 209. Sauter replied, "[y]ou're not going any place until those charts are done," and Murray retorted to Sauter, "[N]ow you're on thin ice." J.A. 210. Murray testified that he made this statement

> because it was [Fenner's] job to fix the charts and the whole context of the badgering from [Sauter] during [those] three hours. . . . I was leaving, and that was exactly what I meant by you're not forcing me to stay here because I can leave. That's what I meant by the thin ice, because you're . . . really pushing me.

J.A. 210. After the "thin ice" comment, Murray testified that Sauter "just glared at [him]," but "tempers were diffused," and he "finished the charts." J.A. 210. Sauter's version of the events is essentially the same, except that he recalls telling Murray to go home and to see him in the morning. According to Sauter, he "didn't know how to take" the "thin ice" comment at the time, J.A. 564, but felt "sure [that Murray] was upset for having to be at the office to complete the task." J.A. 565. But, Sauter testified, "this was a task that had been, for several weeks, assigned to him. On numerous occasions, it was not being completed." J.A. 565.

The following day, Sauter met with Murray to discuss the events of the previous evening. Sauter told Murray that the "thin ice" comment was unacceptable and Murray apologized. Murray told Sauter that he had been feeling pressure to get an election, that he had been having marital difficulties, in large part because of the unpredictable schedule inherent in the position of being a union organizer, and that he was feeling stressed because he had not been told whether he could go on his family vacation, which he had asked to start the following week. Sauter approved the vacation for Murray and Murray left as planned. However, Sauter testified that "[i]n my own opinion, it didn't matter what I attributed [the comment] to, be it family prob-

lems, being pissed off. Fact of the matter remains he threatened me. I was his supervisor. That is unacceptable." J.A. 615.

Within the next day or so, Sauter also met with Lowthers concerning the confrontation with Murray. By this time, Lowthers and Sauter were already concerned that Murray had not been making necessary home calls and doubted Murray's potential to be an organizing leader given his communication and interpersonal skills. Frustrated, Sauter told Lowthers that he "was tired of trying to get things done and [Murray] was not doing them," that by that time he "had a good feeling that K-Mart had probably died [because] . . . there was no contact," and that he "didn't want Dan Murray in the department any more." J.A. 572-73. As explained by Sauter, "[w]e had had the chart incident. We had had the threat. And we had [the K-Mart] campaign that was very hot to begin with [but], due to lack of contacting card signers, they lost interest." J.A. 572. Lowthers agreed. Although the performance and communication problems were troubling, Lowthers testified that he probably would not have terminated Murray solely for those problems; rather, "[u]nder the conditions that existed at the time," the confrontation with Sauter "was the straw that had broken the camel's back. That was the end of it." J.A. 440.

Murray returned to work from his vacation on June 29, 1998. At that time, Sauter informed Murray that he would be rotated back into the stores effective July 11, 1998. At the request of Sauter, who had never been in the position of having to fire someone, Cash was present at the termination meeting. According to Murray, Cash told him that Local 400 did not feel that he had the skills necessary to be an organizer and that he had trouble communicating, but that Sauter told him that "it wasn't anything [he] said" and that it was "not about K-Mart." J.A. 221. Callie Lake, also Caucasian, was terminated the same day for problems she had exhibited in completing assignments and being available to work when needed.

After he was terminated, Murray became convinced that Cash was responsible for the decision because Local 400 had voiced no complaints to him until Cash joined Sauter in the organizing department and that Cash was motivated to get Murray fired because of Murray's race. According to Murray, on the evening of his termination, a Local 400 business representative called him at home and told him that he

and some of the other representatives "feel real bad about what happened and we think it's a black thing." J.A. 228. In addition, Murray testified that Ramirez told him, without elaboration or explanation, that "it was Cash" who was behind the decision. J.A. 232. Both individuals denied making these statements to Murray.

Within the next few days, Murray requested a meeting with Lowthers. According to Murray, "[Lowthers] said we're going to be honest with you because I'm an honest guy. You didn't have the qualifications for the job when I hired you, you didn't have the qualifications for the job when I promoted you and you didn't have the qualifications, so I fired you." J.A. 234. Lowthers also told him that Sauter had concurred in the decision and that Lowthers had also "put a lot of weight in what Don [Cash] sa[id]." J.A. 234.

Upon returning to work at Giant Food, Murray filed this lawsuit against Local 400 and Cash, alleging that he was terminated because of his race. In September 1998, Murray amended his complaint to add Sauter as a defendant and to assert a state law defamation claim against Local 400 and Sauter. Murray alleged that Sauter defamed him after he was terminated by telling Van Ness, who asked why Murray was no longer assigned to the floundering K-Mart campaign, that Murray was not a good organizer.

On remand from an earlier appeal to this court,[1] the district court granted defendants' motion for summary judgment and denied plaintiff's cross-motion for summary judgment. *See Murray v. United Food & Commercial Workers Union*, 229 F. Supp. 2d 465 (D. Md. 2002). Murray appeals.

---

[1]The district court originally granted defendants' motion to dismiss and to compel arbitration of Murray's race discrimination claim, and granted defendants' motion to dismiss Murray's defamation claim for failure to state a claim for relief under Maryland law. Concluding that arbitration was not required and that the complaint adequately alleged the defamation claim, we reversed and remanded for further proceedings. *See Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297 (4th Cir. 2002).

## II.

Murray contends that the district court erred in granting summary judgment on his claims of race discrimination and defamation. We review the grant of summary judgment *de novo*. *See Higgins v. E.I. DuPont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is proper when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion for summary judgment, we view the evidence in the light most favorable to Murray. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). As the non-moving party below, Murray had the ultimate burden of demonstrating a genuine issue of material fact for trial. *See Celotex*, 477 U.S. at 322-23. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of his case." *Thompson v. Potomoc Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks omitted).

### A.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race." 42 U.S.C.A. § 2000e-2(a)(1) (emphasis added). An employee may establish a claim of race discrimination by presenting sufficient evidence that an employer's proffered legitimate reasons for an adverse employment action were merely a "pretext" for race discrimination, under the method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or by presenting sufficient evidence that, despite the existence of legitimate, nondiscriminatory reasons for the adverse employment action, race was also *a* motivating factor in the decision (the "mixed-motive" method). *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc). In this case, Murray proceeds under both frameworks, which we address in turn.

### 1.

We begin with Murray's assertion that he may proceed under the burden-shifting scheme of proof established in *McDonnell Douglas*

and its progeny. Under this "pretext" framework, an aggrieved "employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill* 354 F.3d at 285.

To establish a prima facie case of race discrimination, Murray is required to establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) at the time of the action, he was performing at a level that met Local 400's legitimate job expectations; and (4) his position remained open or was filled by a similarly qualified applicant outside the protected class. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). If he succeeds, the burden shifts to Local 400 to come forward with a legitimate, non-discriminatory reason for the termination. *See id.* If Local 400 meets this burden, the presumption of race discrimination created by the prima facie case disappears from the case, and the burden shifts back to Murray to come forward with sufficient evidence for a jury to conclude, by a preponderance of the evidence, that Local 400's proffered legitimate reasons "were not its true reasons, but were a pretext for discrimination." *Id.* at 143 (internal quotation marks omitted). "Regardless of the type of evidence offered as support for [a] discrimination claim (direct, circumstantial, or evidence of pretext), or whether [the plaintiff] proceeds under a mixed-motive or single-motive theory, '[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'" *Hill*, 354 F.3d at 286 (quoting *Reeves*, 530 U.S. at 153).

In this case, Lowthers (a Caucasian), made the decision to rotate Murray (a Caucasian), Williams (an African-American), and Ramirez (a Hispanic) to probationary full-time organizing positions. After one year of training, Lowthers, after consultation with Sauter, promoted all three members to full-time status. During Murray's employment, Lowthers hired four additional organizers — three Caucasians and one African-American. After Murray's termination, Lowthers hired thirteen organizers — nine Caucasians, two African-Americans, two Asians, and one Hispanic. However, because Murray was elevated from probationary to full-time status just four months prior to his termination and the first person hired for an organizer's position after

Murray's departure was a minority candidate, the district court held that, "[v]iewing th[e] evidence in the light most favorable to the plaintiff, . . . Murray barely makes out a prima facie case of discrimination" sufficient to shift the burden to Local 400 to articulate legitimate non-discriminatory reasons for the decision to terminate him. *Murray*, 229 F. Supp. 2d at 470.

Local 400, in response, overwhelmingly met its burden of production, presenting evidence that Lowthers' decision to terminate Murray was based upon the cumulative effect of four factors: (1) Murray's failure to make sufficient home calls to K-Mart employees who had signed cards to confirm and shore up their support for unionization; (2) Murray's poor interpersonal and communication skills in general and, in particular, during the K-Mart campaign; (3) Murray's failure to timely and properly prepare the required K-Mart charts for presentation during the Local 400 staff meetings, which were held to monitor the progress of each organizer's campaign; and (4) the direct confrontation that ultimately occurred between Sauter and Murray. It is undisputed that the reasons articulated by Local 400 constitute legitimate, non-discriminatory reasons for Murray's termination.

In light of the foregoing, we will assume that Murray has established a prima facie case that has been satisfactorily met by Local 400. Thus, we proceed directly to the ultimate question of whether Murray has met his burden of offering sufficient evidence upon which a reasonable jury could conclude that the reasons articulated by Lowthers were not his true reasons, but instead merely pretext to disguise racial discrimination. *See Reeves*, 530 U.S. at 143; *see also Hill*, 354 F.3d at 286 (noting that "[t]o demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that the protected trait . . . actually motivated the employer's decision (internal quotation marks omitted)). "[P]roof that the employer's proffered reason is unpersuasive, or even obviously contrived," however, "does not necessarily establish that [Murray's] proffered reason [race discrimination] . . . is correct." *Reeves*, 530 U.S. at 146-47 (internal quotation marks omitted). "It is not enough to disbelieve the defendants." *Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004). Rather, the jury must be reason-

ably able to "believe [Murray's] explanation of intentional race discrimination." *Id.*

Murray asserts that he created a genuine issue of material fact regarding whether Lowthers' reasons were pretextual because he presented evidence that Lowthers' concerns regarding Murray's performance and confrontation of his immediate supervisor were not serious enough to warrant termination and that Lowthers treated similarly-situated minority employees less harshly than Murray. We disagree.

We begin with Murray's claim that he has demonstrated the falsity of Lowthers' claim that Murray failed to pursue the home calls necessary to maximize the potential for success on his assigned K-Mart campaign. As support, Local 400 points to Murray's "Organizer Weekly Reporting Forms," which were supposed to record home calls attempted and home calls made during each week, and "Person Profile Records," which also contain information on home calls made to individual employees.

Murray does not dispute that home calls are a critical part of the unionization effort and that organizers are required to turn in "Organizer Weekly Reporting Forms" to document their progress. Nor does he dispute that, between February 1, 1998, and April 18, 1998, he submitted only six such weekly reports, and he submitted no reports after April 18, 1998. Murray admitted that he did not ask to be excused from completing the forms, but that he "just didn't see them as terribly important." J.A. 271. Nevertheless, he claims that he did complete the requisite home calls and that this is reflected by his "call-in" sheets. According to Murray, the organizers "were required to call in at particular times during the day to . . . advise the department on what our plans were for the next segment of the day." J.A. 213. Murray claims his call-in sheets show that he made additional home calls that are not reflected by the scant "Weekly Reporting Forms" or the incomplete "Person Profile Records."[2] Murray also contends that it is improper for Lowthers to point to the absence of

---

[2]The "Person Profile Records" indicate that Murray only made eight home calls during the K-Mart campaign. However, Murray offered evidence that the records would only document the last three calls and, therefore, also do not show every home call made.

the weekly reports when Lowthers did not rely upon Murray's record-keeping as a basis for the termination decision.

In sum, Murray contends that he has created a genuine issue of material fact as to the validity of Lowthers' rationale because he has created a genuine issue of material fact as to whether he, in fact, completed the requisite home calls. Murray's contentions, however, misconstrue his burden. A factual dispute as to whether Murray performed additional home calls not reflected by the required weekly reports does not amount to a factual dispute as to whether Lowthers based his decision, at least in part, upon Lowther's belief that Murray had not fulfilled his duties in this regard. In short, Murray has come forth with insufficient evidence upon which a jury could conclude that Lowthers' proffered reason was false and instead advanced merely as a pretext to cover hidden racial motivations behind the termination decision.

Murray's claim that he has demonstrated the falsity of Lowthers' articulated concern that Murray lacked the communication and interpersonal skills to be an effective leader (as opposed to worker) in an organizing effort also fails to find the requisite evidentiary support.

Murray contends that he has created a genuine issue of material fact regarding the truth of these criticisms of his interpersonal skills because Lowthers had just hired him, promoted him, and assigned him to an important campaign, actions that Lowthers would not have taken if he truly had reservations about Murray's organizing skills. However, it is undisputed that, although Murray had participated in several campaigns in the past, K-Mart was the first campaign that he was assigned to lead. Furthermore, the temporal proximity of Lowthers' promotion of Murray and his assignment as lead organizer on the K-Mart campaign to Lowthers' decision to terminate Murray actually hurts Murray's claim. Lowthers hired Murray, promoted Murray, and fired Murray within the span of seventeen months. Where an "employee [is] hired and fired by the same person within a relatively short time span," there is "a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Although "[t]he plaintiff still has the opportunity to present countervailing evidence of pretext, . . . in most cases involving this situation, such evidence will not be

forthcoming." *Id.*; *see also Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995). Murray has failed to present such sufficient countervailing evidence.

We turn now to the most significant problem cited by Lowthers, the one that led to Murray's immediate dismissal — Murray's failure to timely and adequately prepare the K-Mart campaign progress charts and the confrontation with Sauter that arose as a result of the inadequate charts.

It is undisputed that Murray was required to prepare the charts, that Sauter informed Murray that they were inadequate, and that the confrontation over the charts occurred. Murray claims that Lowthers' reliance upon these events is pretextual because the inadequacy of his charts and his argument with Sauter were not as serious as Sauter later claimed and as Lowthers perceived them to be. As before, however, the flaw in Murray's claim is that he has presented no evidence that Lowthers did not believe that this was a legitimate basis upon which to terminate Murray at the time or that Lowthers used it as a pretext to terminate him for race-based reasons. *See Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." (internal quotation marks omitted)). There is no evidence that Lowthers — the man who hired, promoted, and fired Murray in the span of seventeen months — did not believe that Murray's performance during the K-Mart campaign and his direct confrontation with Sauter warranted his immediate dismissal or that his basis for dismissal was merely pretext either to carry out a racially-motivated discharge on his part or to "cover" for any racially-motivated influence allegedly brought to bear by Cash.[3]

---

[3]Indeed, the crux of Murray's claim is that Cash, who is African-American, was motivated by racial animus, conveyed negative opinions of Murray to Lowthers, and influenced Lowthers to terminate Murray as a result of this racial animus. Murray contends that Lowthers' reliance upon the chart and the "thin ice" incident with Sauter was designed to "cover" Cash's motivations after the fact. As discussed *infra*, this theory also fails because Murray has failed to present sufficient evidence that Cash was racially biased or that, even if he was, he possessed a degree of power justifying the imputation of that bias to Local 400.

Murray's reliance upon the fact that Lowthers issued written disciplinary notices to two minority Local 400 organizers the following year, as opposed to imposing immediate termination, is also unavailing. In March 1999, Robin Williams, the African-American organizer who was hired with Murray in early 1997, was issued a counseling letter for calling Sauter a liar during an argument over her attendance at a conference. And, in July 1999, Rose Lee, an organizer of Asian descent who was hired after Murray, was given a written warning for attendance problems and, ultimately, fired for the same reason. Lowthers testified that his decision to issue such written warnings was, on advice of legal counsel, adopted as a result of Murray's lawsuit. But, regardless, these instances of disciplinary action provide Murray no solace because he was not similarly situated to either of the other employees. Unlike Williams and Lee, Lowthers had already received unfavorable performance evaluations of Murray from both Cash and Sauter in the weeks leading up to the confrontation between Sauter and Murray, and Lowthers, after consulting with Sauter following the chart incident and confrontation, made the decision to terminate Murray based upon these cumulative problems. Hence, as the district court correctly observed, neither of the employees were similarly situated to Murray, nor did they perform in a comparably deficient manner.

We agree with the district court's determination that Murray failed to proffer sufficient evidence of pretext to avoid summary judgment. Murray has presented no direct evidence of racial bias on the part of Lowthers, Sauter, Cash, or any other Local 400 official. And, Murray has presented insufficient evidence upon which a reasonable jury could conclude, by a preponderance of the evidence, that the reasons given by Lowthers for his decision were false, that Murray was treated in a disparate fashion from his minority counterparts, or that Murray's race otherwise motivated Local 400's decision to terminate him.

2.

Next, we turn to Murray's claim under the mixed-motive methodology. *See* 42 U.S.C.A. § 2000e-2(m). Under this method of proof, Murray may establish a claim of racial discrimination if he can demonstrate that, although Lowthers' decision may have been based upon

legitimate, nondiscriminatory reasons, it was also at least in part motivated by racial bias on the part of a relevant decisionmaker. *See Hill*, 354 F.3d at 284. Regarding such a claim, "[t]he employee . . . need not demonstrate that the prohibited characteristic was the *sole* motivating factor to prevail," *id.* (emphasis added), but must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that race . . . was a motivating factor for [the] employment practice," *Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148, 2155 (2003) (internal quotation marks omitted). "In such cases, . . . it is sufficient for the individual to demonstrate that the employer was motivated to take the adverse employment action by both permissible and forbidden reasons." *Hill*, 354 F.3d at 284.

Determining whether one who harbors a discriminatory bias may be deemed a "decisionmaker" for purposes of Title VII is a separate inquiry. We are not limited to the actions and statements of only the formal decisionmakers for an employer. *See id.* at 288. However, "an employer will be liable not for the improperly motivated person who merely influences the decision, but for the person who in reality makes the decision." *Id.* at 291.

Under the mixed-motive theory, Murray asserts that race was a motivating factor in his dismissal by Local 400 because Cash, who is African-American, was motivated by racial bias to provide Lowthers with negative evaluations of him and that these biased evaluations influenced, at least in part, Lowthers' ultimate decision to terminate him. In order to survive summary judgment on this theory, however, it was incumbent upon Murray to present sufficient evidence that Cash harbored racial animus against him *and* that Cash's racial animus was properly imputed to Local 400. *See id.* (holding that "to survive summary judgment, an aggrieved employee who rests [his] discrimination claim . . . upon the discriminatory motivations of a subordinate employee must come forward with sufficient evidence that the subordinate employee possessed such authority as to be viewed as the one principally responsible for the decision or the actual decisionmaker for the employer"). Murray has failed to establish either the requisite racial bias or power on the part of Cash to present this theory to a jury.

First, Murray's claim that Cash harbored racial animus against Caucasian employees in general, and him in particular, is extraordi-

narily weak. Murray points to (1) an alleged telephone call received by Murray on the evening of his termination, in which a Local 400 business agent told him (without explanation or elaboration) that he and several other Local 400 representatives believed "it's a black thing"; (2) Cash's support during an earlier campaign in Virginia for a paid Martin Luther King, Jr., holiday for *all* employees in the workplace "because we've been held down too long or we've been held down enough," J.A. 239-40; (3) Cash's statement to Sauter, also during the earlier campaign, that Cash felt they could rotate Murray off of the campaign to give another organizer experience "if you've got another experienced white male," J.A. 241; and (4) Cash's involvement in a minority coalition within the union. This evidence (assuming its admissibility in the first instance) is a patently insufficient basis upon which a reasonable jury could conclude that Cash harbored racial animus that motivated him to provide Lowthers with negative evaluations of Murray's organizing skills and long-term prospects of being an effective lead organizer.

Second, even if we were to presume racial animus on the part of Cash, Murray cannot prevail under his mixed-motive theory because he has also failed to present sufficient evidence upon which the jury could conclude that Cash was the actual decisionmaker or the one principally responsible for Local 400's decision to terminate him. It is undisputed that Lowthers made the decision to hire Murray on a probationary basis and to transfer him to full-time permanent status before assigning Murray to lead the K-Mart campaign. It is undisputed that Lowthers made the decision to terminate Murray only after he had personally observed Murray's performance on that campaign and received less than favorable evaluations regarding Murray's performance in the K-Mart campaign from *both* Sauter and Cash. And, it is undisputed that Lowthers decision occurred immediately after he met with Sauter regarding the events surrounding the confrontation by Murray and Sauter's frustration with Murray's continued reluctance or inability to properly prepare the organizational charts and otherwise perform the tasks expected of him. In short, although Murray has presented evidence that Cash had expressed reservations about Murray's long-term potential to be an effective lead organizer to Lowthers

prior to Lowthers decision, such evidence is inadequate to impute any racial motivations held by Cash to Local 400.[4]

For the foregoing reasons, we hold that Murray has failed to present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that Cash was motivated to remove Murray based on race, or that Cash was the actual decisionmaker or the one principally responsible for his termination. Accordingly, we affirm the district court's grant of summary judgment to the defendants on this claim as well.

B.

We now turn to Murray's claim that the district court erred in granting summary judgment to Local 400 and Sauter on Murray's state law claim for defamation. After Murray was discharged, Sauter and another organizer met with Van Ness and other key K-Mart employees. When Van Ness expressed dissatisfaction that Murray was no longer on the campaign, Sauter "leaned over to [Van Ness] and said, 'Believe me, he was not a good organizer.'" J.A. 1466.

"Under Maryland law, a defamatory statement is one that tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Samuels v. Tschechtelin*, 763 A.2d 209, 241-42 (Md. Ct. Spec. App. 2000) (internal quotation marks omitted). "To establish a prima facie case of defamation when the plaintiff is not a public figure, the plaintiff must prove: (1) that the defendant made a defamatory communication to a third person; (2) that the statement was false; (3) that the defendant was at

---

[4]Murray's attempt to create a dispute regarding Cash's prominence in the decision through his conversation with Ramirez, another organizer, falls far short of the requisite showing. According to Murray, Ramirez told Murray that Cash was responsible (a representation that Ramirez denies). However, Ramirez possessed no authority for Local 400 and the comment, which was not accompanied by any explanation, is entirely too speculative to support Murray's claim that a jury could conclude, based upon it, that Cash was the person principally responsible for his termination.

fault in communicating the statement; and (4) that the plaintiff suffered harm." *Id.* at 242.

"While the tort of defamation is generally viewed as one based upon false assertions of fact, it may also be based upon the expression of an opinion to a third person if the "'opinion contains implied assertions of underlying objective fact.'" *Murray v. United Food & Commercial Workers Int'l Union*, 289 F.3d 297, 305 (4th Cir. 2002) (quoting *Samuels*, 763 A.2d at 242). The statement that Murray "was not a good organizer," if false, is defamatory *per se* under Maryland law. *Id.* at 306. And, as correctly noted by the district court, Murray has established a genuine issue of material fact as to whether he was, in fact, a good organizer (as opposed to whether Lowthers believed he was a good organizer and terminated him for discriminatory reasons). *See Murray*, 229 F. Supp. 2d at 477. Thus, Murray has sufficiently established the first two elements of the *prima facie* case of defamation. The district court granted summary judgment on the claim, however, because Murray failed to prove that Sauter was at fault in communicating the statement and that Murray was harmed by the statement. We agree.

"[W]hen a plaintiff establishes that a statement was defamatory *per se* and, by clear and convincing evidence, demonstrates that it was made with actual malice, a presumption of harm to reputation arises from the publication of words actionable *per se*." *Samuels*, 763 A.2d at 245 (internal quotation marks and alteration omitted). But, if "the defendant was merely negligent in making the false statement, the plaintiff must still prove actual damages." *Id.* In order to establish actual malice, Murray was required to demonstrate, "by clear and convincing evidence," that Sauter "published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity." *Id.* at 242 (internal quotation marks omitted). Murray has failed to produce such clear and convincing evidence of actual knowledge or reckless disregard on Sauter's part. Sauter's comment was made in private response to Van Ness's inquiry as to why Murray was no longer on the campaign, and there is no evidence that the comment was made to or heard by any other K-Mart employee. At most, Sauter was merely negligent in making the statement to Van Ness. Because Murray has failed to present any evidence of actual damages as a result of the statement, his defamation claim fails.

## III.

For the foregoing reasons, the decision of the district court granting summary judgment to the defendants is hereby affirmed.

*AFFIRMED*